**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| THARON PAUP, CAROL J. SHUFFIT, and PATRICK J. MALLOY, III, Trustee of the Bankruptcy Estate of Gwen Coffelt, ) ) ) ) ) | |
| Plaintiffs, ) ) ) | |
| v. ) ) | Case No. 05-CV-214-TCK-FHM |
| GEAR PRODUCTS, INC., ) ) ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Before the Court is Defendant Gear Products, Inc.'s ("GP") Motion for Summary Judgment (Docket No. 47). For the reasons explained below, this motion is granted in its entirety.

**I.   Factual Background**

Tharon Paup ("Paup"), Carol Shuffit ("Shuffit"), and Gwen Coffelt ("Coffelt") were terminated by GP.[1] At the time of their terminations, Paup was fifty-eight years of age, Shuffit was fifty-nine years of age, and Coffelt was sixty-three years of age. Paup, Shuffit, and Coffelt filed suit against GP, alleging they were terminated based on their age in violation of the Age Discrimination in Employment Act ("ADEA").

---

[1] On June 5, 2007, the Court allowed Patrick J. Malloy, III, trustee of Coffelt's Chapter 7 bankruptcy estate, to be substituted as Plaintiff in place of Coffelt. When the Court refers to Plaintiffs collectively, it refers to the three terminated employees – Paup, Coffelt, and Shuffit.

GP is a wholly owned subsidiary of Blount International, Inc. ("Blount") and operates a production facility in Tulsa, Oklahoma. In or around February 2001, members of Blount's management staff met with GP's management staff and informed them that GP must perform a reduction in force ("RIF"). As a result, GP terminated twenty-six individuals in February 2001 ("February 2001 RIF"). By the summer of 2001, GP's order intake continued to drop, and Blount's management informed GP's management that further reductions were necessary. On October 2, 2001, eight more individuals were terminated. ("October 2, 2001 RIF"). GP's management staff believed this was the end of the reductions. However, in late October 2001, GP was again informed by Blount that three more individuals needed to be terminated ("Late October RIF"). Plaintiffs were the three employees terminated as a result of the Late October RIF.

In order to determine what three people would be terminated during the Late October RIF, the President of GP, Tom Brenton ("Brenton"), called a meeting consisting of himself, four members of management, and GP's Human Resources Director, Robin Bond ("Bond"). Thus, six people were present at this meeting. At the meeting, Brenton informed them that three more employees had to be cut. It was determined that the cuts would be made from administrative and clerical employees, as opposed to shop workers. The pool of clerical workers from which the terminations would be made consisted of eight individuals. At the same meeting or a later meeting, Brenton asked these six members of management to rank the eight clerical employees from a score of one to five (five being the highest) in seven categories: (1) flexibility; (2) sense of urgency; (3) initiative; (4) self-starter; (5) multi-tasking abilities; (6) accuracy; and (7) attitude. Following completion of the rankings, all individuals except Brenton and Bond were asked to leave the room while Brenton and Bond

compiled the results. When the other individuals returned to the conference room, they were told the names of the three individuals who would be terminated, which consisted of Paup, Shuffit, and Coffelt. They were not told the scores or rankings of each individual.

The summary judgment record does not include testimony of Brenton or Bond. The record does contain the testimony of two members of management who completed the rankings but were out of the room when the results were compiled, Tim Simmons ("Simmons") and Jeffrey Schmale ("Schmale"). Simmons and Schmale both testified that it was their understanding that the three individuals that were terminated – Paup, Coffelt, and Shuffit – received the three lowest scores. (Simmons Dep., Ex. 7 to Pls.' Resp. to Def.'s Mot. for Summ. J., at 53:12-19; Schmale Dep., Ex. E to Def.'s Mot. for Summ. J., at 9:4-15.) This was true with one exception. The following chart shows the results of the ranking process, as well as the respective ages of the eight ranked individuals:[2]

| Name | Score | Age at time of ranking |
|---|---|---|
| Sally Farmer | 28 points | 50 |
| Alissa Tanner | 19.5 points | 33 |
| Brian Callendar | 19 points | 36 |
| Bill Vickers | 19 points | 50 |
| **Plaintiff Gwen Coffelt** | **18.5 points** | **63** |
| **Plaintiff Tharon Paup** | **15 points** | **58** |
| Peggy West | 15 points | 58 |
| **Plaintiff Carol Shuffit** | **10 points** | **59** |

---

[2] This chart was compiled by the Court based on Defendant's undisputed Statement of Fact 10 (setting forth names and scores) and Exhibits 7 and 8 to Simmons' deposition (listing birth dates of all GP employees).

Coffelt and Shuffit were terminated on October 26, 2001. (*See* Coffelt and Shuffit "Notice of Reduction in Force" letters, Exs. G and H to Def.'s Mot. for Summ. J.)[3] Also on October 26, 2001, Paup was placed on layoff status. (*See* Paup "Notice of Layoff," Ex. I to Def.'s Mot. for Summ. J.) Paup was never asked to return to GP.

## II.     Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006) (citation omitted). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id.* (citation omitted). However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in his complaint but must "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). In the context of a case brought under federal employment laws, the trial court must "make a judgment as to whether the evidence . . . could persuade a reasonable jury that the employer had discriminated against the plaintiff." *Hooks v. Diamond Crystal Specialty Foods, Inc.*, 997 F.2d 793, 798 (10th Cir. 1998).

---

[3] Coffelt's Notice of Reduction in Force is dated October 1, 2001. However, it is not disputed that Coffelt was actually terminated in late October 2001, following the rankings process that occurred in late 2001. Neither party has explained or addressed this discrepancy, and the Court concludes that the date on the Notice of Reduction in Force is a clerical error.

### III.     Application of Judicial Estoppel to Claims of Malloy/Coffelt

On September 18, 2005, following the filing of this lawsuit, Coffelt and her husband filed Chapter 7 bankruptcy in the United States Bankruptcy Court for the Northern District of Oklahoma ("Bankruptcy Case"). Coffelt did not list her claim against GP in any relevant portions of her bankruptcy pleadings. For example, Coffelt answered "none" when asked to list "all suits and administrative proceedings to which the debtor is or was a party within one year immediately preceding the filing of this bankruptcy case." (*See* Bankruptcy Petition, Ex. U to Def.'s Mot. for Summ. J., at 20.) On December 27, 2005, Plaintiff received a Chapter 7 discharge. In its Motion for Summary Judgment, GP argued that Coffelt was judicially estopped from asserting her claim against GP because she did not list it as an asset in her bankruptcy pleadings. Sometime thereafter, the Bankruptcy Case was "reopened."[4]

On June 4, 2007, Patrick J. Malloy III ("Malloy"), Trustee of the Bankruptcy Case, filed an advice of bankruptcy and requested to be substituted as Plaintiff for Coffelt in this lawsuit. The Court allowed substitution, and Malloy was substituted as Plaintiff in place of Coffelt. Malloy adopted the Response previously filed by Coffelt as his opposition to GP's Motion for Summary Judgment.

In its Reply, which was filed following Malloy's substitution, GP argued that the doctrine of judicial estoppel operated to prevent the case to proceed in any capacity "on

---

[4] Neither Coffelt nor Malloy filed any pleadings verifying that the Bankruptcy Case was reopened. In its Reply brief, GP assumes the Bankruptcy Case was reopened. (*See* Def.'s Reply 7 ("The fact that Plaintiff Coffelt moved to re-open her Bankruptcy Case only after Defendant's Motion [for summary judgment] was filed – does not alter the fact that she made a false statement in the Bankruptcy Case.").) For purposes of this motion, the Court assumes the Bankruptcy Case was reopened.

5

behalf of Plaintiff Coffelt." (Def.'s Reply 9.) In later pleadings, however, after being allowed to file supplemental authority on this issue, GP stated that "[t]he point Defendant made through its supplement is that although it may be inappropriate to apply judicial estoppel to bar the claims of the Trustee herein, such argument does not, under [the supplemental authority provided], preclude application of the judicial estoppel doctrine to bar any recovery by *Plaintiff Coffelt*." (Def.'s Mot. to Strike 2, Doc. 79 (emphasis in original).) Thus, GP concedes, and the Court concludes, that judicial estoppel does not bar Malloy, the bankruptcy trustee, from asserting claims on Coffelt's behalf. This is because Malloy has never taken any inconsistent positions in the Bankruptcy Case. *See Eastman v. Russell*, 493 F.3d 1151, 1155 n.3 (10th Cir. 2007) (stating that application of judicial estoppel against trustee was inappropriate because it was the debtor, and not the trustee, that had "engaged in contradictory litigation tactics" by failing to list the lawsuit as an asset of the estate); *In re Riazuddin*, 363 B.R. 177, 187-88 (10th Cir. BAP 2007) (reasoning that judicial estoppel should not have been applied to trustee who "never took an inconsistent position" in the bankruptcy proceeding).[5]

The Court rejects GP's contention that Malloy should not be allowed to proceed with the claim on Coffelt's behalf because Coffelt will have effectively "laundered" her causes of action by failing to list them before her first discharge. In *In re Riazuddin*, 363 B.R. 177 (10th Cir. BAP 2007), the Tenth Circuit Bankruptcy Court of Appeals reversed a bankruptcy

---

[5] If Coffelt remained a Plaintiff in the case, application of judicial estoppel to prevent Coffelt's claim would be permissible under Tenth Circuit law. *See Eastman*, 493 F.3d at 1159-60 (holding that district court's application of judicial estoppel to prevent personal injury lawsuit was not abuse of discretion where debtor failed to list claim in Chapter 7 bankruptcy case in which he received a discharge).

6

court's denial of a debtor's motion to reopen the debtor's bankruptcy case to include an omitted asset – a personal injury claim. The court reasoned that, if the bankruptcy case was reopened and the estate recovered money on the personal injury claim, creditors would be "notified of the Trustee's recovery of assets" and would "have the opportunity to file claims so that they may receive a share of the estate." *Id.* at 186. This was true even though the debtor had received a discharge. Thus, the fact that Coffelt has received one discharge does not prevent her creditors from receiving an opportunity to share in any amounts recovered by Malloy on her behalf in this litigation.[6]

**IV.     Prima Facie Case**

Plaintiffs admit they do not have direct evidence that age was a determining factor in their terminations. Instead, Plaintiffs rely on the proof scheme established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-04 (1973), which is applicable to ADEA cases. *See Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1420 (10th Cir. 1991). "Under that proof scheme, to set forth a prima facie case of age discrimination, a plaintiff must ordinarily prove that '(1) the affected employee was within the protected age group; (2) [she] was doing satisfactory work; (3) [she] was discharged despite the adequacy of this work; and (4) a younger person replaced [her].'" *Id.*

The fourth element, requiring a showing of a younger replacement, is modified in cases involving a reduction in force ("RIF") because "the discharged employee is not always replaced with another employee." *Ingels v. Thiokol Corp.*, 42 F.3d 616, 621 (10th Cir.

---

[6] With respect to GP's request to "bar any recovery by Plaintiff Coffelt," it is not necessary to address this question. Coffelt is no longer a party to the litigation, and any damages on Coffelt's claim will be recovered by Malloy as Trustee of the reopened bankruptcy case rather than Coffelt as an individual.

7

1994), *abrogated on other grounds by Martinez v. Potter*, 347 F.3d 1208 (10th Cir. 2003). In RIF cases, rather than requiring a plaintiff to show he was replaced by a younger employee, the fourth element requires a plaintiff to show "some evidence that the employer intended to discriminate against her in reaching its RIF decision." *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1166 (10th Cir. 1998). The Tenth Circuit made clear in *Beaird*, however, that the fourth element "should not be understood to require a plaintiff to produce evidence that age was a determining factor in the employer's motivation" because this would "effectively fuse the prima facie and pretext steps." *Id.* at 1167. Instead, in order to satisfy the fourth element, a plaintiff need only present circumstantial evidence that he was "treated less favorably than younger employees" during the RIF. *Id.* at 1165; *see Pippin v. Burlington Resources Oil and Gas Co.*, 440 F.3d 11868, 1193 (10th Cir. 2006). For example, "a plaintiff who is fired pursuant to a RIF and who held a similar position to a younger retained employee can satisfy the fourth element." *Beaird*, 145 F.3d at 1167.

The first and third elements are not disputed as to any Plaintiff. GP alleges that Shuffit cannot prove the second element, requiring a showing that she was doing satisfactory work. In order to meet her burden as to this element, Shuffit must merely introduce "some evidence of good performance." *Denison*, 941 F.2d at 1420. There is evidence that Shuffit was employed for at least fifteen years in the "top" clerical position in the company, had survived two previous RIFs, and was considered (but rejected) for a move to a different position during the Late October 2001 RIF. The Court finds this to be sufficient to meet the minimal burden imposed at the prima facie stage. GP's rebuttal evidence is that Shuffit was counseled on various occasions for excessive visiting and slow work performance. However, this goes to the "weight of the evidence of satisfactory performance" and not to

Shuffit's "initial burden to produce such evidence." *Id.* GP also argues that Shuffit's low score (10 points) and ranking (eighth place) on the rankings chart demonstrate a lack of satisfactory work. Again, this goes to the weight of the evidence rather than her prima facie case. In addition, the ranking was completed only because GP was *forced* to eliminate three additional individuals from its staff. This is distinguishable from an independent statement by Shuffit's superiors that her work was so inadequate that she was not qualified for continued employment. Shuffit has submitted sufficient eevidence to make a prima facie case as to the second element.

The fourth element is disputed as to all three Plaintiffs. As explained above, the Tenth Circuit has held that a plaintiff can satisfy the fourth element in an RIF case by showing that she was treated less favorably than a younger employee in a similar position. GP selected the eight positions to consider for termination during the Late October 2001 RIF and ranked them for purposes of the Late October 2001 RIF. The Court therefore concludes that these eight administrative employees are the proper group of similarly situated employees with which to compare Plaintiffs' ages. *Cf. Whittington v. Nordam Group, Inc.*, 429 F.3d 986. 995 (10th Cir. 2005) (discussing whether plaintiff should have been compared to only one other employee or whether he was "similarly situated" to a larger pool of employees). Of the five retained administrative employees that were considered for termination during the Late October 2001 RIF, four are younger than Plaintiffs. Specifically, two retained employees were fifty; one retained employee was thirty-six; and one retained employee was thirty-three. This constitutes sufficient evidence to demonstrate the fourth element of a prima facie case because Plaintiffs have shown they were "treated less

favorably than younger employees" during the Late October 2001 RIF. *See Beaird*, 145 F.3d at 1165.

In addition, each Plaintiff has presented evidence that some of her specific job duties were taken over by a younger employee. For example, of the seventeen tasks performed by Shuffit as executive administrative assistant, eight were taken over by Alissa Tanner, who was twenty-six years younger than Shuffit. (*See* Ex. P to Def.'s Mot. for Summ. J.) Of the seven tasks performed by Paup, three were taken over by Bill Vickers, who was eight years younger than Paup. (*See* Ex. N. to Def.'s Mot. for Summ. J.) Of the numerous tasks performed by Coffelt, two have been taken over by Sally Farmer, who was thirteen years younger than Coffelt. (*See* Ex. R to Def.'s Mot. for Summ. J.) Thus, there is evidence that at least some of Plaintiffs' job duties were absorbed by younger employees. This is also sufficient evidence to satisfy the fourth element in an RIF case. *See Pippin*, 440 F.3d at 1193 (finding fourth element satisfied in case in which younger employee took over tasks of employee terminated as a result of RIF).

**V.     Nondiscriminatory Reason and Pretext**

"Establishing a prima facie case of age discrimination under the ADEA creates a presumption of discriminatory intent that the defendant may rebut by asserting a facially nondiscriminatory reason for the employee's termination." *Beaird*, 145 F.3d at 1165. "The plaintiff may then resist summary judgment if she can present evidence that that proffered reason was pretextual, 'i.e. unworthy of belief,' or otherwise introduces evidence of illegal discriminatory motive." *Id.* (citations omitted).

In general, GP's legitimate, nondiscriminatory reason for the terminations is "that Gear Products reduced its workforce and eliminated positions in an effort to avoid

10

bankruptcy." (Def.'s Mot. for Summ. J. 15.) With respect to how it selected each Plaintiff for termination from the pool of eight administrative employees, GP asserted that the selections were "based upon the results of the ranking process." (Def.'s Mot. for Summ. J., Fact 11.) In addition to the rankings process, GP also asserted that it took into account the dispensability of each of the various positions considered for elimination. With respect to Paup, GP asserted that "the purchasing coordinator position was completely eliminated because it was primarily clerical in nature and the responsibilities of the position could easily be absorbed by others or eliminated in their entirety." (Def.'s Mot. for Summ. J. 18; *see also* Explanation of Tharon Paup Termination, Ex. N. to Def.'s Mot. for Summ. J. ("While [Paup's] work performance was good, her position was recognized as one that has to be eliminated to cut costs, at least temporarily.").) With respect to Shuffit, GP asserted: "The executive administrative assistant position was eliminated because it was not a full-time position" and because "it was determined that the minimal duties of the executive administrative assistant position could easily be absorbed by others." (Def.'s Mot. for Summ. J. 20-21; *see also* Explanation of Carol Shuffit Termination, Ex. P to Def.'s Mot. for Summ. J. ("The decision to eliminate [Shuffit's] position was made mainly due to the fact that her position was one that would have the least negative impact on the organization as a whole.").) With respect to Coffelt, GP stated that "[W]hen Gear Products installed a new computer system, [Coffelt's] job became primarily administrative in nature." (Def.'s Mot. for Summ. J. 22; *see also* Explanation of Gwen Coffelt Termination, Ex. R to Def.'s Mot. for Summ. J. ("[Coffelt's] position was highly administrative (performing double-checks, overseeing, gathering status information, etc.) and some things were done by [Coffelt] because she desired to have control of all processes. Due to the economic times, we could

11

no longer afford the luxury of someone who checked and rechecked.").) Thus, GP advances the RIF and its implementing criteria (the rankings process/analysis of positions) as the facially nondiscriminatory reason for the terminations. This is sufficient to satisfy its "burden under the second step of *McDonnell Douglas*." *Beaird*, 145 F.3d at 1168 (holding that "the RIF and its implementing criteria" met the employer's burden at this stage).

After an employer offers a legitimate, non-discriminatory reason for the termination, a plaintiff "may defeat summary judgment by presenting sufficient evidence such that a reasonable jury could conclude that the proffered nondiscriminatory reason for the employment action is pretextual, that is, 'unworthy of belief.'" *Simms v. Okla.*, 165 F.3d 1321, 1328 (10th Cir. 1999). "In a RIF case, a plaintiff can demonstrate pretext in three principal ways." *Beaird*, 145 F.3d at 1168. First, a plaintiff can "can argue that her own termination does not accord with the RIF criteria supposedly employed." *Id.* For example, a defendant's failure to comply with its own RIF policy may suffice to show pretext. *Id.* (citing *Christie v. Foremost Ins. Co.*, 785 F.2d 584, 586-87 (7th Cir. 1986)). However, "minor inconsistencies in the application of RIF criteria may be too insubstantial to allow a reasonable jury to infer the RIF was pretextual." *Id.* Second, "a plaintiff can adduce evidence that her evaluation under the defendant's RIF criteria was deliberately falsified or manipulated so as to effect her termination." *Id.* Third, a plaintiff can adduce evidence that the RIF itself is pretextual. *Id.* "For instance, a plaintiff may establish that an employer actively sought to replace a number of RIF-terminated employees with new hires." *Id; see also Pippin*, 440 F.3d at 1193.

Plaintiffs offer the following as evidence of pretext: (1) GP did not follow its written "layoff policy" (the "Layoff Policy") in implementing the Late October 2001 RIF; (2) GP

12

has offered inconsistent reasons for its termination decisions; (3) GP did not strictly follow the rankings process in making its termination decisions; (4) the OHRC made a finding of discrimination as to each Plaintiff; and (5) certain comments evidence that GP had discriminatory motives. (*See* Pls.' Resp. to Def.'s Mot. for Summ. J. 5-8.)[7]  Based on Plaintiffs' arguments, they are primarily utilizing the first method of showing pretext in an RIF case – that their terminations do not "accord with the RIF criteria supposedly employed." *See Beaird*, 145 F.3d at 1168.[8]

### A. Failure to Follow Layoff Policy

In completing the October 2001 RIF, GP did not consider length of employment and therefore, to some extent, failed to follow its Layoff Policy, which provides:

> In the event of layoff, company-wide length of service will be considered in determining who will be laid off. However, in the event special skills are required for the smooth operation of the plant or office, the Company will reserve the right to retain employees based on required skill, ability and experience as opposed to length of service. The Company reserves the right to retain the employee whose skills and abilities best meet the requirements of the job.

(1/99 Layoff Policy, Ex. P to Def.'s Mot. for Summ. J.)  The evidence indicates that this is a general layoff policy that was not utilized in any of the three 2001 RIF decisions.  Instead, during the two RIFs preceding the Late October 2001 RIF, members of management were

---

[7] The Court has summarized and condensed Plaintiffs' pretext evidence into the above four categories. Plaintiffs have also submitted evidence regarding each specific Plaintiff. (Pls.' Resp. to Def.'s Mot. for Summ. J. 9-11.)  Such evidence is discussed only where deemed material by the Court.

[8] Plaintiffs have presented no evidence that GP "deliberately manipulated" the rankings process or any other aspect of the Late October 2001 RIF, nor have Plaintiffs presented any evidence that the RIF itself was actually a method of hiring new, younger employees.  Accordingly, the second and third methods of showing pretext are not at issue.

asked to determine whose position could be most easily eliminated and were not told to consider length of service. (*See* Simmons Dep. 10-30:16.) There is no evidence that the Layoff Policy was considered or in any way relevant to the 2001 RIF decisions. Therefore, the fact that it was not followed in the Late October 2001 RIF, which was merely the "final cut," does not make it more or less likely that age discrimination occurred. As stated in *Beaird*, a plaintiff can demonstrate pretext in the RIF context by showing that the "termination[s] did not accord with the RIF criteria supposedly employed." *Beaird*, 145 F.3d at 1168. The RIF criteria employed here was the rankings process/position analysis, and any failure to follow the Layoff Policy is not probative of pretext in this specific RIF context.

In addition, the Layoff Policy clearly reserved the right to retain employees based on factors other than length of employment in order to retain employees whose "skills and abilities best meet the requirements of the job." (Layoff Policy, Ex. P to Def.'s Mot. for Summ. J.) Based on the rankings process and analysis of the administrative positions considered for elimination, GP determined that the five other retained individuals best served GP's needs and best met the requirements of the remaining positions. This is consistent with the reservation of rights clause in the Layoff Policy.

### B. Alleged Inconsistencies in Reasons for Decision

The Court finds no genuine inconsistencies in reasons GP has given for making the decisions to terminate Plaintiffs. Plaintiffs argue that GP's reasons provided to the Court differ from the reasons provided to the OHRC. In the documents provided to the OHRC, GP stated: "When it became imperative that a certain number of administrative/clerical support positions be eliminated, the staff met and ranked all individuals who fell within these

categories." ("Overview of Recent Layoff Decision Matrix," Ex. L to Def.'s Mot. for Summ. J.)  GP then further described its decision-making process regarding which administrative positions considered for elimination were expendable or not expendable. (*Id.*) GP further explained that Plaintiffs were, in some instances, considered for other retained positions but were rejected for various business reasons. (*Id.*)  In the Court's view, this is consistent with GP's position in this lawsuit, which is that the termination decisions were based on the rankings process and other factors regarding the necessity of the ranked employees' positions.[9]

The Court rejects Plaintiffs' argument that GP alleges to have considered, but did not in fact consider, the dispensability of various positions in making the Late October 2001 RIF decisions. (*See* Pls.' Resp. to Def.'s Mot. for Summ. J. 5 (arguing that GP alleges to have but did not actually consider which administrative employees would be "least missed").) Plaintiffs argue that members of GP management testified that the rankings process alone formed the basis of the terminations decisions, which tends to show pretext.  As explained above, it is true that Simmons and Schmale believed the rankings alone formed the basis of the termination decisions.  However, it is undisputed that Simmons and Schmale were not

---

[9] Plaintiffs attempt to classify GP's asserted nondiscriminatory reason in this lawsuit as relating solely to the analysis of the dispensability of various positions. (*See* Pls.' Resp. to Def.'s Mot. for Summ. J. 17-18.)  However, the Court does not find it proper to limit GP's asserted nondiscriminatory reason in this manner.  In its Statement of Facts, GP explained the criteria and results of the rankings process and stated that "based upon the results of the rankings process, Plaintiff Coffelt's and Plaintiff Shuffit's positions were eliminated and Plaintiff Paup was laid off."  (Def.'s Mot. for Summ. J., Fact 11.)  In its brief, GP then goes on to describe the analysis of why Plaintiffs' positions were deemed expendable. (*See* Def.'s Mot. for Summ. J. 18-20; *see also* "Overview of Recent Layoff Decision Matrix," Ex. L to Def.'s Mot. for Summ. J.) Accordingly, the rankings process and position analyses are both asserted as reasons for Plaintiffs' terminations.

15

present in the conference room when the final decisions were made by Brenton and Bond. Evidence before the Court indicates that other factors – specifically, the tasks and requirements of the specific positions assigned to the individuals considered for termination – also played a role in the final decisions as to who would be terminated during the Late October 2001 RIF. (*See* "Overview of Recent Layoff Decision Matrix," Ex. L to Def.'s Mot. for Summ. J.) There is simply no inconsistency between Simmons' belief that the rankings process formed the sole basis of the termination decision and other record evidence asserting that other factors were considered in addition to the rankings process. Simmons was present in the room for the rankings process but was not the final decision maker. The Court does not find any material inconsistencies in the record that would tend to show GP's proferred reasons for the terminations were a pretext for age discrimination.[10]

### C.     Failure to Strictly Follow the Rankings Process

GP did not strictly follow the rankings process in making its termination decisions because it terminated the fifth, seventh, and eighth ranked employees rather than the sixth, seventh, and eighth ranked employees. However, the Court first observes that there was not a significant deviation from the rankings process. Second, GP has presented evidence that the sixth-ranked employee, Peggy West ("West"), was retained instead of Coffelt because she held the somewhat unique position of switchboard operator. Coffelt, who was ranked above West, was apparently not considered as a possible replacement for West as Switchboard Operator. However, this was logical because Coffelt's position, Document

---

[10] Testimony of Bond or Brenton would have been a welcome addition to the record. However, as the record stands, the Court finds nothing inconsistent about Simmons' deposition testimony and other record evidence indicating that other factors were considered in addition to the ranking.

Administrator, was not purely clerical in nature and involved some technical skills. Thus, placing Coffelt in a receptionist position would have been a drastic change in her duties. As stated by GP, the "logical place to move [Coffelt] would have been into some kind of drafting/CAD position," rather than a receptionist-type position. (*Id.*) GP has offered a reasonable explanation for retaining West despite the fact that she received a lower score than Coffelt.

Finally, GP's failure to strictly follow the rankings process does not, in this case, demonstrate that age discrimination may have occurred. West, the sixth-ranked employee, is fifty-eight years of age. West is the same age as Paup, one year older than Shuffit, and five years older younger than Coffelt. Although the Tenth Circuit has held that a five year age difference is not an insignificant age difference as a matter of law, *see Whittington v. Nordam Group, Inc.*, 429 F.3d 986, 995 (10th Cir. 2005), the Court finds the small age gap between West and Plaintiffs renders the failure to strictly follow the rankings process significantly less probative of age discrimination. In short, the rankings process was, in large part, followed. In the instance where it was not followed, GP has offered evidence to rebut any inference of age discrimination – that West was retained because she was the most logical individual to occupy the switchboard operator position.

### D.     OHRC's Decision

The OHRC found, with respect to each Plaintiff, that "the evidence of record indicates that Complainant was laid off due to her age." (OHRC Case Summaries, Ex. 1 to Pls.' Resp. to Def.'s Mot. for Summ. J.) These findings are based in part on statistical evidence. The OHRC considered the ages of terminated employees from all three RIFs in 2001 and determined that "seventy percent of the personnel laid off were over the age of

17

forty." (*Id.*) However, Plaintiffs, in their briefing submitted to the Court, have not mentioned or argued that statistical evidence contributes to their showing of pretext, and the Court is without sufficient information to properly analyze this issue. Further, the Court is not convinced that statistical evidence that groups together all terminated employees and that spans all of 2001 is probative of pretext. *See Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 987 (10th Cir. 1996) (stating that statistical evidence is flawed if it "fails to compare similarly situated individuals" and if it "fails to properly take into account nondiscriminatory explanations"). The more specific issue presented here is whether GP discriminated in making the Late October 2001 RIF decisions.

The OHRC also relied, in each case, on GP's failure to follow the Layoff Policy. For reasons explained above, the Court disagrees that such failure is probative of pretext in this particular case. The OHRC's other reasons for finding discrimination related to the satisfactory or good performance of each Plaintiff's work compared to younger, retained employees. However, the Court finds that such "good performance" evidence, while sufficient to make a prima facie case, is not sufficient evidence to demonstrate pretext in this case in light of (1) the rankings process, in which all Plaintiffs were ranked at or near the bottom of the list, and (2) GP's determination that Plaintiffs' positions were most expendable. Even if Plaintiffs may have been performing equal to or better than certain retained employees, it is undisputed that GP had to choose three to terminate regardless of their level of performance. There is simply no indication that these three Plaintiffs were chosen because of their age rather than for the reasons articulated by GP.

### E.     History/Comments as Evidence of Age Discrimination

Finally, Plaintiffs contend that GP has a "history" of engaging in age discrimination. The evidence offered by Plaintiffs in support of this contention is Shuffit's deposition testimony that "once [a certain employee] left the company, then [that employee] confirmed that [former manager Barry Rollinson] had been brought there to eliminate the older, longer tenured people." (Shuffit Dep., Ex. 5 to Pls.' Resp. to Def.'s Mot. for Summ. J., at 40-42.) This testimony relates to events that occurred in 1993 and is not probative of whether the reason offered for the Late October 2001 RIF was a pretext for discrimination. Plaintiffs also contend that one stray comment made by Steve Copeland ("Copeland"), a member of management involved in the rankings process, evidences pretext.  Upon Plaintiffs' terminations, Copeland stated to Coffelt that "somebody needs to get a good lawyer." (Coffelt Dep., Ex. 6 to Pls.' Resp. to Def.'s Mot. for Summ. J., at 89:12-22.) The Court finds this comment to be ambiguous at best and wholly insufficient to convince a reasonable jury that GP engaged in age discrimination in conducting the Late October 2001 RIF.

Considering the above evidence as a whole, the Court finds that Plaintiffs have not shown that their "termination[s] did not accord with the RIF criteria supposedly employed." *See Beaird*, 145 F.3d at 1168.  Instead, the evidence shows that GP followed its selected RIF criteria in making its termination decision.  In the one instance GP strayed from the ranking, it explained this decision based on the specific duties – operating the switchboard – performed by the retained individual.  Further, in addition to the ranking, it is clear that Defendants analyzed the necessity of each clerical position considered for termination before making its final decisions and determined that Plaintiffs' positions were expendable.  The Court finds that any deviation from the RIF criteria constitute only "minor inconsistencies

in the application of RIF criteria" and are "too insubstantial to allow a reasonable jury to infer the RIF was pretextual." *Beaird*, 145 F.3d at 1168. Instead, the record indicates that GP was forced to conduct an RIF, that it utilized a rankings process and also considered the dispensability of the various clerical positions, and that Plaintiffs were selected for termination for nondiscriminatory reasons. *See Furr*, 82 F.3d at 985 (failing to find a genuine dispute of fact because, *inter alia*, "the manner in which a company chooses to conduct a RIF is within the company's sound business discretion, and Plaintiffs have failed to adduce any evidence that the RIF criteria were a pretext for discriminatory motive").[11]

GP's Motion for Summary Judgment (Docket No. 47) is GRANTED in its entirety.

**ORDERED this 26th day of September, 2007.**

*/s/ Terence Kern*
_____
**TERENCE KERN**
**UNITED STATES DISTRICT JUDGE**

---

[11] In addition to failing to present sufficient evidence to create a question of fact as to pretext, Plaintiffs have further failed to present other evidence of discriminatory motive. Plaintiffs' deposition testimony in response to the questions of why they believe age played a role in their terminations are vague, speculative, and insufficient to create a genuine issue of fact. (*See, e.g.*, Shuffit Dep., Ex. O to Def.'s Mot. for Summ. J., at 94:13-96:10; Paup Dep., Ex. 4 to Pls.' Resp. to Def.'s Mot. for Summ. J., at 69:12-73:20; Coffelt Dep., Ex. 6 to Pls.' Resp. to Def.'s Mot. for Summ. J., at 60:9-62:13.)